**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES and AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES LOCAL 2578, | |
| Plaintiffs, | Case No. 8:19-cv-02322-PX |
| v. | |
| U.S. OFFICE OF SPECIAL COUNSEL, | |
| Defendant. | |

**MEMORANDUM IN SUPPORT OF**
**DEFENDANT'S MOTION TO DISMISS AMENDED COMPLAINT**

## **TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................. 1

BACKGROUND ............................................................................................................. 4

I.      STATUTORY BACKGROUND............................................................................ 4

      A.     The Hatch Act ........................................................................................... 4

      B.     The Office of Special Counsel .................................................................. 5

II.     OSC'S NOVEMBER 2018 ADVISORY OPINION.......................................... 8

III.    THIS LITIGATION.......................................................................................... 10

      A.     Plaintiffs' Counsel's Engagement with OSC......................................... 10

      B.     Plaintiffs' Complaint............................................................................... 11

LEGAL STANDARDS................................................................................................. 12

ARGUMENT ............................................................................................................... 13

I.      THIS COURT LACKS SUBJECT MATTER JURISDICTION OVER
      PLAINTIFFS' CLAIMS.................................................................................... 13

      A.     Plaintiffs Have Not Alleged an Injury to Support Standing
              for Their Vagueness Challenge (Count III). ......................................... 13

      B.     Plaintiffs' Challenges to the Advisory Opinion
              Cannot Proceed Because They Are Not Ripe. ....................................... 14

             1.     The issues are not fit for judicial review.................................... 14

             2.     Premature judicial review would harm OSC and Congress's Hatch
                     Act enforcement scheme, while Plaintiffs would not be harmed by
                     permitting their claim to ripen into a concrete dispute. ............. 20

      C.     Congress Has Foreclosed Plaintiffs' Attempt to Bypass the CSRA's
              Exclusive Review Scheme by Filing Suit in District Court.................... 22

             1.     The CSRA establishes a scheme of exclusive review by the MSPB,
                     with judicial review in the Federal Circuit, not the district courts........... 23

       2.      Plaintiffs have asserted claims that Congress intended to proceed first before the MSPB, followed if necessary by judicial review in the Federal Circuit ................................................................................... 24

II.     PLAINTIFFS HAVE FAILED TO STATE A CLAIM UNDER EITHER THE FIRST OR FIFTH AMENDMENT. ....................................................... 26

    A.     OSC's Advisory Interpretation of the Hatch Act is Not Overbroad (Count I). ................................................................. 28

    B.     The Advisory Opinions Do Not Impermissibly Discriminate on the Basis of Either Content or Viewpoint (Count II). ..................................... 31

        1.      Regulation of government employees' speech based on its content is not subject to strict scrutiny, and has been repeatedly upheld. ............. 32

        2.      The Advisory Opinion does not discriminate based on viewpoint. .......... 33

    C.     The Advisory Opinion Is Not Impermissibly Vague (Count III). ........................ 37

        1.      Use of the term "#Resist" and variations thereof...................................... 38

        2.      Impeachment advocacy............................................................................ 40

CONCLUSION ................................................................................................................. 42

## INTRODUCTION

Eighty years ago, Congress enacted the Hatch Act, which imposes restrictions on partisan political activity by government employees.  The Supreme Court has since repeatedly "confirm[ed] the judgment of history, a judgment made by this country over the last century that it is in the best interest of the country, indeed essential, that federal service should depend upon meritorious performance rather than political service, and that the political influence of federal employees on others and on the electoral process should be limited," and thus has "unhesitatingly" affirmed and reaffirmed the government's authority to "bar[] . . . partisan political conduct by federal employees" in the manner of the Hatch Act.  *U.S. Civil Serv. Comm'n v. Nat'l Ass'n of Letter Carriers, AFL-CIO*, 413 U.S. 548, 556-57 (1973) ("*Letter Carriers*").

In pursuit of these objectives, Congress in 1978 created the U.S. Office of Special Counsel ("OSC"), and empowered it to enforce the Hatch Act by pursuing disciplinary action for civil violations, and to issue advisory opinions to employees subject to the Act.  *See* 5 U.S.C. § 1212(f).  The advisory opinion mechanism allows for timely responsiveness to emerging issues, and provides needed advice to the federal workforce on their Hatch Act obligations.  The advisory opinion process is thus especially important during election years, with their cyclical churn of new candidates, messages, and tactics, in helping federal employees understand and abide by the statutory limits on partisan political activity.  Further, as the Supreme Court has recognized, this mechanism for dispensing preliminary advice in advance of—or, ideally, in lieu of—employee disciplinary actions serves to alleviate any potential chill in exercising First Amendment rights.  *See Letter Carriers*, 413 U.S. at 580 n.22.

The current federal election cycle, like many before it, has introduced new terms and arguments into the lexicon of partisan political speech—namely, the concept of the "#Resistance"

and calls for the impeachment of candidates for federal office.  In response to inquiries from federal employees seeking guidance on the Hatch Act implications of using these terms and arguments, in November 2018, OSC issued an Advisory Opinion.  And when reports about that Opinion sparked follow-up questions, OSC issued a Clarification.  OSC continues to offer further guidance on this topic in responding to individual inquiries and through group trainings.

Rather than seek further clarification from OSC at any time in the more than fourteen months since OSC issued its guidance, Plaintiffs, a national labor organization representing federal civilian employees and a local branch of that organization, instead filed the instant suit challenging OSC's November 2018 Advisory Opinion under the First and Fifth Amendments, and, after Defendant moved to dismiss, obtained leave to file an Amended Complaint.  Although Plaintiffs cloak their claims in the garb of various First Amendment doctrines, at bottom, Plaintiffs assert that the Advisory Opinion impermissibly chills federal employees from engaging in constitutionally-protected speech.  Plaintiffs' original complaint was deficient because it failed to identify a single specific example of protected speech that a federal employee wishes to engage in but, as a result of the Advisory Opinion, chooses not to.  Although after amendment, Plaintiffs include two conclusory statements asserting that two unidentified union members wish to discuss at work whether President Trump should be impeached and to use at work the term "resist," those assertions are not articulated with sufficient specificity to support standing as to Plaintiffs' vagueness claim, let alone state any valid claim for relief.

Plaintiffs' claims should initially be dismissed for want of subject-matter jurisdiction because of two additional deficiencies that Plaintiffs failed to cure when amending their complaint. First, Plaintiffs' challenge to an OSC advisory opinion is not ripe, as made plain by the D.C. Circuit in a case functionally identical to this one, *American Federation of Government Employees, AFL-*

*CIO v. O'Connor*, 747 F.2d 748 (D.C. Cir. 1984). Just as two other district courts outside the D.C. Circuit have done, this Court should follow *O'Connor*'s highly persuasive reasoning and dismiss Plaintiffs' challenge as unripe. Second, even if Plaintiffs' claims were ripe, they must be dismissed because Congress, in devising the statutory scheme, intended for such claims to be raised before the Merit Systems Protection Board, with any judicial review to follow in the U.S. Court of Appeals for the Federal Circuit, not by leaping directly to district court as Plaintiffs have attempted here.

Further, even assuming some basis exists for district court jurisdiction over Plaintiffs' claims, they should nonetheless be dismissed because the Advisory Opinion is not overbroad, impermissibly content- or viewpoint-discriminatory, or impermissibly vague. Plaintiffs cannot prevail on their First Amendment overbreadth claim because the employees' interests here are outweighed by the well-recognized, substantial government interests in limiting the demonstrated ill effects of civil servants' partisan political activity while on duty. And even if the Advisory Opinion does make distinctions on the basis of content, the First Amendment permits speech restrictions on government employees based on the type of speech at issue. Plaintiffs are moreover mistaken when they assert viewpoint discrimination—the Opinion applies equally to all employee speech involving the terms at issue, regardless of partisan favor one way or the other. And Plaintiffs' reliance on excerpted quotations from various Adminstration employees is not a basis for the viewpoint-discriminaton claim they assert—if those alleged statements support any claim, it would be one of selective enforcement, which Plaintiffs have not asserted. Finally, Plaintiffs' vagueness claim fails because Plaintiffs offer nothing more than conclusory allegations of a chilling effect, and proffer no particularized examples of the speech they allegedly wish to engage in. And even if the Advisory Opinion were, on its face, unduly vague, the existence of a

mechanism by which either Plaintiff, or any of their members, may seek an advisory opinion from OSC dispels any concern posed by such vagueness.

For all of these reasons, Plaintiffs' Amended Complaint should be dismissed.

## BACKGROUND

I.    **STATUTORY BACKGROUND**

    A.    **The Hatch Act**

First enacted in 1939 and substantially amended in 1993, the Hatch Act "limits the political activities of federal employees in the interests of promoting efficient, merit-based advancement, avoiding the appearance of politically-driven justice, preventing the coercion of government workers to support political positions, and foreclosing use of the civil service to build political machines." *Burrus v. Vegliante*, 336 F.3d 82, 85-86 (2d Cir. 2003); *see* An Act to Prevent Pernicious Political Activities, Pub. L. No. 76-252, 53 Stat. 1147 (1939); Hatch Act Reform Amendments of 1993, Pub. L. No. 103-94, 107 Stat. 1001 (codified in scattered sections of Title 5 of U.S. Code).[1]   The Act contains two types of limitations on federal employees' political activities.  First, the Act generally prohibits employees, without regard to time or place, from using their official authority to influence an election, from affecting the political activity of those subject to government authority, from engaging in political fundraising, and from running for partisan political office.  *See* 5 U.S.C. § 7323(a)(1)-(4).  Second, the Act prohibits "political activity" by federal employees while they are in specifically defined on-the-job circumstances.  *Id.* § 7324.

Of those two prohibitions, the latter is relevant in this case.  It provides that

> [a]n employee may not engage in political activity . . . while . . . on duty; . . . in any
> room or building occupied in the discharge of official duties by an individual
> employed or holding office in the Government of the United States or any agency

---

[1] Other provisions of the Act, not at issue in this case, were amended in 2012.  Hatch Act Modernization Act of 2012, Pub. L. No. 112-230, 126 Stat. 1616 (2012).

> or instrumentality thereof; . . . wearing a uniform or official insignia identifying the
> office or position of the employee; or . . . using any vehicle owned or leased by the
> Government of the United States or any agency or instrumentality thereof.

*Id.* § 7324(a).  "[E]mployee" is defined to mean "any individual, other than the President and the

Vice President, employed or holding office in . . . (A) an Executive agency other than the

Government Accountability Office; or (B) a position within the competitive service which is not

in an Executive agency."  *Id.* § 7322(1).[2]  "Political activity" is defined by regulation as "an activity

directed toward the success or failure of a political party, candidate for partisan political office, or

partisan political group."  5 C.F.R. § 734.101.  "Partisan," in turn, is defined as "related to a

political party."  *Id.*  The regulations provide a list of examples of "political activity" that the Hatch

Act permits, *see id.* §§ 734.202-734.208, and prohibits, *see id.* §§ 734.302-734.307.  These

regulations do not state that federal employees cannot talk or express an opinion about political

issues—only that they cannot engage, while on duty or in the federal workplace, in activity directed

at the success or failure of a political party, such as attending political events while on duty,

stuffing envelopes for a candidate while on duty, or displaying buttons, pictures, or signs at work.

*See* 5 U.S.C. § 7323(c); 5 C.F.R. §§ 734.101, 734.306, Examples 11, 13, 16.

### B.     The Office of Special Counsel

In 1978, Congress passed the Civil Service Reform Act, which, as part of a broad reform

of the federal civil service, created the Office of Special Counsel.  *See* Pub. L. No. 95-454, 92 Stat.

1111; 5 U.S.C. § 1211 *et seq.*  OSC's primary mission is to safeguard the merit system, including

---

[2] In addition to federal employees, the Hatch Act restricts certain political activity by employees
of state and local governments whose programs are federally funded.  *See* 5 U.S.C. §§ 1501-1508.
Those provisions are not at issue in this case.

by investigating and prosecuting civil violations of the Hatch Act.[3]

Congress authorized OSC to investigate alleged civil violations of the Hatch Act and, if warranted and appropriate, pursue disciplinary action for those violations. 5 U.S.C. § 1216(a)(1).[4] Any person or entity, whether or not employed by or associated with the federal government, may file with OSC a Hatch Act complaint alleging that a federal employee has engaged in prohibited political activity. *See* 5 U.S.C. § 1216(c); Second Declaration of Ana Galindo-Marrone ¶ 5 ("Galindo-Marrone Decl.").[5] OSC's Hatch Act Unit ("HAU"), consisting of six attorneys and one administrative specialist, is primarily responsible for carrying out OSC's duties under the Hatch Act. Galindo-Marrone Decl. ¶ 2. Generally, if the Special Counsel, typically upon recommendation from the HAU, determines that disciplinary action is warranted based on an employee's Hatch Act violation, OSC files a written complaint against the employee with the Merit Systems Protection Board ("MSPB" or "Board").[6] 5 U.S.C. § 1215(a)(1); Galindo-Marrone Decl. ¶ 10. After a hearing before an Administrative Law Judge (and, if necessary, further proceedings

---

[3] OSC is also responsible for enforcing the Civil Service Reform Act, the Whistleblower Protection Act, and the Uniformed Services Employment & Reemployment Rights Act.

[4] Although criminal penalties exist for certain types of violations related to the Hatch Act, *see* 5 C.F.R. § 734.702 (listing prohibitions), OSC is not authorized to enforce them and they are not part of this case.

[5] OSC offers the Second Galindo-Marrone Declaration in support of its arguments for dismissal under Fed. R. Civ. P. 12(b)(1), and does not rely on it in arguing for dismissal under Fed. R. Civ. P. 12(b)(6). Where, as here, "a defendant challenges the existence of subject matter jurisdiction in fact, the plaintiff bears the burden of proving the truth of such facts by a preponderance of the evidence," and "the district court may then go beyond the allegations of the complaint and resolve the jurisdictional facts in dispute by considering evidence outside the pleadings, such as affidavits." *United States ex rel. Vuyyuru v. Jadhav*, 555 F.3d 337, 347-48 (4th Cir. 2009). OSC also offers this Declaration in support of its opposition to Plaintiffs' motion for a preliminary injunction, ECF No. 20.

[6] Prior to filing a complaint with the MSPB, OSC may also attempt to settle a case. In such settlements, both the employee and the employee's agency would have to agree to any proposed disciplinary action.

before the Board), the Board issues a final order.  5 U.S.C. § 1215(a)(2)-(3).  The Board may dismiss the allegations or, upon finding a violation, may impose disciplinary action ranging from a reprimand to removal from federal service.  *Id.* § 1215(a)(3)(A).  An employee subject to disciplinary action by the MSPB is entitled to judicial review in the Federal Circuit.  *Id.* §§ 1215(a)(4), 7703(b)(1).  Although OSC's Hatch Act enforcement authority is not limited to investigating allegations brought to OSC via complaints from federal employees or members of the public, as a practical matter it generally devotes its limited investigative resources to such complaints.  Galindo-Marrone Decl. ¶ 14.

Not every Hatch Act complaint that OSC receives results in disciplinary action; indeed, in the large majority of complaints investigated, OSC takes no steps against an employee.  In each of the past three fiscal years, for example, the HAU received well over 200 complaints, in response to which it has annually issued between 37 and 49 warning letters, obtained 10 or 11 corrective actions, and obtained between 4 and 6 disciplinary actions.  Galindo-Marrone Decl. ¶ 15.

In addition to investigating and pursuing disciplinary action for alleged Hatch Act violations, OSC is authorized to issue advisory opinions regarding the Act, 5 U.S.C. § 1212(f), which the HAU ordinarily does in response to inquiries from federal employees or members of the public, Galindo-Marrone Decl. ¶ 7.  Inquiries can take the form of telephone calls, emails, or letters asking whether certain activity is (or would be) permissible under the Hatch Act.  *Id.* ¶¶ 7, 9.  This act of "dispensing informal advice" through the issuance of advisory opinions has been recognized as "a valuable public service," *O'Connor*, 747 F.2d at 754, and in each of the past three years, HAU has issued more than 1,100 informal advisory opinions in response to individual inquiries.  Galindo-Marrone Decl. ¶ 8.  In addition, OSC typically issues approximately 50 formal advisory opinions per year.  Galindo-Marrone Decl. ¶¶ 7, 8.

While an advisory opinion reflects OSC's view of whether actual or hypothetical activity may constitute a Hatch Act violation, except as to certain employees appointed by the President, the MSPB retains the exclusive authority within the Executive Branch to determine whether a civil Hatch Act violation has occurred and, if so, to impose disciplinary action. *See* 5 U.S.C. §§ 1204(a), 1215(a)(3), 1215(b); 5 C.F.R. § 734.102(b). Neither the MSPB nor the Federal Circuit on judicial review is bound to accept OSC's interpretations of the Hatch Act. *O'Connor*, 747 F.2d at 753. Similarly, an OSC advisory opinion does not itself impose restrictions on an employee's activity, and there exists no legal requirement that an employee follow an OSC advisory opinion. Galindo-Marrone Decl. ¶ 11. On the other hand, when OSC opines in an advisory opinion that certain activity does not constitute a Hatch Act violation, that opinion serves to create a safe harbor from prosecution for a Hatch Act violation for employees who engage in that activity.

## II.    OSC'S NOVEMBER 2018 ADVISORY OPINION

On February 7, 2017, OSC issued an advisory opinion in response to "numerous questions" from federal employees on permissible activity under the Hatch Act regarding President Trump. Galindo-Marrone Decl. ¶ 17. OSC stated that while the President had filed paperwork with the Federal Election Commission, he had not yet officially declared his candidacy for reelection, and opined that "not all expressions of support or opposition to President Trump constitute political activity for purposes of the Hatch Act." *Id.*, Ex. A. On March 5, 2018, OSC updated its February 2017 opinion to advise that, in light of developments in his reelection campaign, the President had become officially a candidate for reelection, and reminded federal employees that they may not, consistent with the Hatch Act, engage in activity directed at the success or failure of the President's candidacy while they are on duty or in the workplace. *Id.* ¶ 18, Ex. B.

In August 2018, a federal employee sought advice from OSC about the Hatch Act

implications of, *inter alia*, discussing President Trump's potential impeachment and using the term "Resistance" and related terms. *Id.* ¶ 19. OSC responded on November 20, 2018. *Id.* Because the inquiry and response raised issues similar to queries posed by other federal employees, OSC elected to distribute on November 27, 2018 a modified version of its response opinion, with individualized aspects of the opinion removed, to its external email list, for which federal ethics officials and employees of agency legal offices generally sign up. *Id.*; Am. Compl. ¶ 18, ECF No. 24. Owing to media reports mischaracterizing OSC's November 27 advisory opinion, OSC chose to issue a clarification on November 30, 2018 (the "Clarification"), which was again distributed to OSC's email list and also posted, together with the November 27 advisory opinion, on the OSC website. Galindo-Marrone Decl. ¶ 20; Am. Compl. ¶ 19.

The November 27, 2018 advisory opinion, as clarified on November 30, 2018 (collectively, the "Advisory Opinion"), addressed three topics, two of them directly relevant here: advocacy for or against the impeachment of a candidate for federal office; and use of the terms "resistance," "#resist," and their derivatives when that use relates to resistance to President Trump.[7] Galindo-Marrone Decl., Ex. C ("AO") at 2. As to impeachment, OSC opined that "advocacy for or against an effort to impeach a candidate is squarely within the definition of political activity for purposes of the Hatch Act" because doing so "is clearly directed at the failure of that candidate's campaign for federal office." *Id.*; Am. Compl. ¶ 20. OSC clarified, however, that employees who are on duty "may discuss whether reported conduct by the president warrants impeachment and express an opinion about whether the president should be impeached" without contravening the Act. Galindo-Marrone Decl., Ex. D ("Clarification") at 2; Am. Compl. ¶ 21. While OSC opined that,

---

[7] References herein to "#Resist" or "Resistance" or any variation on these terms, are intended, for purposes of brevity, to encompass all such variations, unless indicated otherwise.

for example, displaying an "#Impeach45" poster in a federal office or a "Don't Impeach Trump" sticker on a government-owned vehicle would constitute political activity, discussions of impeachment without advocating for or against it would not.  Clarification at 2.

As to "#Resist" and its derivatives, OSC stated that it would "presume that the use or display of the hashtags #resist and #resistTrump, in isolation, is political activity under the Hatch Act."  AO at 2; Am. Compl. ¶¶ 32-33.  But OSC also made clear that using such terms "in relation to an issue," rather than "directed toward the success or failure of a political party, candidate for partisan political office, or partisan political group," would not be considered political activity under the Hatch Act.  Clarification at 2; Am. Compl. ¶¶ 34-35.

As of this filing, OSC has, to the best of its knowledge, received no request for advice from AFGE, AFGE Local 2578, or any of their members regarding the scope of the Advisory Opinion on use of the term "#Resist" or impeachment advocacy.  Galindo-Marrone Decl. ¶ 30.  Nor has OSC, to the best of its knowledge, received any Hatch Act complaints concerning use of the term "#Resist" or impeachment advocacy by either Plaintiff or any of their members.  *Id.* ¶ 31.

## III.   THIS LITIGATION

### A.   Plaintiffs' Counsel's Engagement with OSC

Following OSC's issuance of the Advisory Opinion, American Oversight, which is counsel for Plaintiffs in this case, initiated a dialogue with OSC about the Opinion.[8]  Galindo-Marrone Decl. ¶ 23.  In written exchanges with OSC, American Oversight expressed concerns about the Advisory Opinion, which OSC addressed.  Galindo-Marrone Decl. ¶¶ 24-25, Exs. F-I.  In April 2019, the Special Counsel, his senior staff, and the leadership of the HAU met with representatives from American Oversight to discuss the stated concerns about the Opinion.  *Id.* ¶ 26.  Following

---

[8] Although American Oversight is counsel for Plaintiffs in this action, it nowhere referenced either Plaintiff in its communications with OSC.  Galindo-Marrone Decl., Exs. F-I.

that meeting, OSC and American Oversight exchanged further correspondence about the Opinion. *Id.* ¶ 27.  During their several months of communications, American Oversight never asked OSC about the Hatch Act consequences of specific conduct by a federal employee, nor did it seek from OSC an advisory opinion about any specific prospective conduct.  American Oversight's focus instead was on its differences with the legal conclusions reached by OSC.  *Id.* ¶ 28.

###### B.    Plaintiffs' Complaint

On August 13, 2019, Plaintiffs filed their Complaint.  OSC moved to dismiss on November 4, 2019.  ECF No. 16.  Rather than respond to OSC's Motion, Plaintiffs sought leave to amend the Complaint, which the Court granted on January 29, 2020.  ECF Nos. 19, 23.  Additionally, on January 24, 2020, Plaintiffs filed a motion for preliminary injunction, ECF No. 20, an opposition to which Defendant is filing concurrently with the instant motion.

In the Amended Complaint, Plaintiffs assert three claims for relief based on OSC's Advisory Opinion.  First, Plaintiffs claim that "OSC's interpretation of the Hatch Act" set forth in the Advisory Opinion "is unconstitutionally overbroad in violation of the First Amendment."  Am. Compl. ¶¶ 53-54.   Second, Plaintiffs claim that OSC's interpretation of the Hatch Act impermissibly discriminates on the basis of both content and viewpoint in violation of the First Amendment.  *Id.* ¶¶ 58-65.  Third, Plaintiffs assert a claim under the First and Fifth Amendments that the Advisory Opinion "is vague and fails to afford fair notice of the conduct and speech that it prohibits."  *Id.* ¶ 69.  For each claim, Plaintiffs assert, "[i]n the alternative," that the Hatch Act's prohibition on political activity does not extend to advocacy for or against impeachment or use of the term "#Resist" or its derivatives, and that OSC therefore "lacked authority to issue [the Advisory Opinion]."  *Id.* ¶¶ 55, 66, 73.  Plaintiffs seek a judicial declaration that OSC's interpretation of the Hatch Act set forth in the Advisory Opinion violates the First and Fifth Amendments; an injunction precluding OSC from enforcing or relying on the Advisory Opinion;

and an order requiring OSC to rescind the Advisory Opinion.  Am. Compl. 22-23, ¶¶ (a)-(e).

## LEGAL STANDARDS

Federal Rule of Civil Procedure 12(b)(1) permits a defendant to challenge the court's subject-matter jurisdiction.  "A defendant may challenge subject-matter jurisdiction in one of two ways: facially or factually."  *Beck v. McDonald*, 848 F.3d 262, 270 (4th Cir. 2017), *cert denied*, *Beck v. Shulkin*, 137 S. Ct. 2307 (2017).  "In a facial challenge, the defendant contends that a complaint simply fails to allege facts upon which subject matter jurisdiction can be based," *id.* (citation omitted), and "the plaintiff is afforded the same procedural protection that exists on a motion to dismiss" under Rule 12(b)(6), *Wikimedia Found. v. Nat'l Sec. Agency*, 857 F.3d 193, 208 (4th Cir. 2017) (citation omitted).  When challenging the factual basis for subject-matter jurisdiction, the plaintiff bears the burden of proving it exists.  *Richmond, Fredericksburg & Potomac R.R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991).  "In determining whether jurisdiction exists, the district court is to regard the pleadings' allegations as mere evidence on the issue, and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment."  *Id.*  The moving party should prevail "if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law."  *Id.*

A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint. To survive such a motion, the complaint must contain "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  In assessing a Rule 12(b)(6) motion, the Court must consider all well-pled allegations as true and view the complaint in the light most favorable to the plaintiff.  *See Albright v. Oliver*, 510 U.S. 266, 268 (1994).  However, these principles do not apply to "a legal conclusion couched as a factual allegation," *Papasan v. Allain*, 478 U.S. 265, 286 (1986), nor to "allegations that are merely conclusory, unwarranted

– 12 –

deductions of fact, or unreasonable inferences," *Veney v. Wyche*, 293 F.3d 726, 730 (4th Cir. 2002)

(citation omitted).  In assessing a Rule 12(b)(6) motion, a court may consider documents of which

it may take judicial notice, without converting the motion into one for summary judgment.  *Sec'y*

*of State for Def. v. Trimble Navigation Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007).

## ARGUMENT

### I.    THIS COURT LACKS SUBJECT MATTER JURISDICTION OVER PLAINTIFFS' CLAIMS.

#### A.    Plaintiffs Have Not Alleged an Injury to Support Standing for Their Vagueness Challenge (Count III).[9]

As to Count III, even after amending their pleading, Plaintiffs lack standing because they

have not asserted that they have self-censored from engaging in specific, constitutionally-protected

speech out of fear that they would be penalized for that speech under OSC's Hatch Act

interpretation.  As the Fourth Circuit has explained, although "self-censorship" can constitute a

cognizable injury in First Amendment vagueness claims, "subjective or speculative accounts of

such a chilling effect . . . are not sufficient," and "[a]ny chilling effect . . . must be objectively

---

[9] OSC no longer moves to dismiss Counts II and III in the Amended Complaint for lack of standing, but it nonetheless does not concede that newly added paragraphs 48 and 49 suffice to establish associational standing.

Moreover, Plaintiffs again present no allegation attempting to establish organizational standing.  An organization asserting standing in its own right must adequately allege the familiar standing requirements that apply to individuals: (1) injury in fact; (2) causation; and (3) redressability.  *See S. Walk at Broadlands Homeowners Ass'n v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 182 (4th Cir. 2013) (citing *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000)).  The injury-in-fact requirement demands that the organization allege facts plausibly showing (a) an impairment of the organization's ability to advance its purposes, combined with (b) a "'consequent drain on the organization's resources.'"  *Id.* at 183 (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)); *see also Knowledge Ecology Int'l v. Nat'l Inst. of Health*, No. 18-1130, 2019 WL 1585285 (D. Md. Apr. 11, 2019).  As Plaintiffs assert no allegation that would satisfy either aspect of the requirement, nor do they otherwise make any attempt to identify an injury to their interests as organizations as a result of the challenged OSC guidance, they lack standing to sue on their own behalf.

reasonable." *Benham v. City of Charlotte*, 635 F.3d 129, 135 (4th Cir. 2011) (citations omitted).

Here, although Plaintiffs' Amended Complaint contains new allegations identifying two members of the Plaintiff organizations who allegedly have self-censored as a result of the Advisory Opinion, these new allegations nonetheless fail to cure the standing deficiency as to Count III that Defendant identified in its original motion to dismiss.  The new allegations do not identify specific, constitutionally-protected speech that the identified members wish to engage in but have held back out of fear of penalty under the Hatch Act.  Absent such allegations, Plaintiffs' claim necessarily relies wholly on "speculative accounts of . . . a chilling effect" which "are not sufficient." *Id.*  And as to whether "[a]ny [alleged] chill" is "objectively reasonable," *id.*, no court could even undertake the inquiry absent specific allegations of the prospective speech that is allegedly chilled.  Because the Amended Complaint lacks anything more than conclusory allegations of self-censorship, which lack the requisite specificity under the doctrine, Plaintiffs have failed to allege an injury to support standing for their vagueness challenge.

> **B.    Plaintiffs' Challenges to the Advisory Opinion Cannot Proceed Because They Are Not Ripe.**

"[R]ipeness is a question of subject matter jurisdiction."  *South Carolina v. United States*, 912 F.3d 720, 730 (4th Cir. 2019).  "[W]hether a claim is ripe 'turns on the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration.'"  *Id.* (quoting *Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 201 (1983)).  Measured against these standards and persuasive appellate court precedent in a factually identical case, Plaintiffs' claims are unripe and must be dismissed.

> **1.    The issues are not fit for judicial review.**

A controversy is not fit for judicial review unless it is "presented in a 'clean-cut and concrete form,'" *id.* (quoting *Miller v. Brown*, 462 F.3d 312, 319 (4th Cir. 2006)), and the

challenged action is "'final and not dependent on future uncertainties or intervening agency rulings,'" *id.* (quoting *Franks v. Ross*, 313 F.3d 184, 195 (4th Cir. 2002)).  Similarly, "a plaintiff's claim is not ripe for judicial review 'if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all.'"  *Id.* (quoting *Scoggins v. Lee's Crossing Homeowners Ass'n*, 718 F.3d 262, 270 (4th Cir. 2013)).

Longstanding precedent of the D.C. Circuit—which, even if not binding, is "highly persuasive," *see Lockheed Martin Corp. v. Def. Contract Audit Agency*, 397 F. Supp. 2d 659, 664 (D. Md. 2005)—makes clear that an action cannot proceed when a plaintiff challenges OSC's advisory interpretation of the Hatch Act, as Plaintiffs do here.  In *American Federation of Government Employees v. O'Connor*, the court held that two federal employee unions' constitutional challenge to an OSC advisory opinion concerning the permissibility of voter registration drives was "not ripe for judicial review."  747 F.2d at 749.

*O'Connor* involved an OSC Hatch Act advisory opinion concluding that members of a union that had endorsed partisan candidates for federal office were not permitted to participate in voter registration drives at the worksite.  *Id.* at 750-52.  The unions, like Plaintiffs here, claimed that OSC's advice violated the First Amendment and sought declaratory and injunctive relief invalidating the advice and prohibiting its enforcement.  *Id.* at 750.  The district court rejected OSC's non-justiciability arguments and, reaching the merits, found OSC's advice consistent with both the Hatch Act and the First Amendment.  *Id.* at 752.  The D.C. Circuit vacated that decision and remanded with instructions to dismiss the case as unripe.  *Id.* at 757.

Citing the "sweeping generality" of the unions' case, the D.C. Circuit found it "unsuitable for court adjudication" for two different reasons.  *Id.* at 752.  First, OSC's advisory interpretation "creates no law and binds neither the public nor any agency or officer of government."  *Id.* at 752-

53. The court explained that "if an actual case materialized," it would fall to the MSPB to decide whether a particular voter registration drive ran afoul of the Hatch Act. *Id.* at 753-54. Second, the plaintiff unions had "tendered no fact-particular case to or against the Special Counsel." *Id.* at 756. Because "[t]he Special Counsel has confronted no [union] member with a prosecution threat should he or she participate in a particular voter registration drive," the court held that the unions had shown no "genuine threat of enforcement" sufficient to sustain ripeness. *Id.* at 756-57.

The facts of *O'Connor* are functionally identical to this case. Under its statutory authority, *see* 5 U.S.C. § 1212(f), OSC issued the Advisory Opinion to agency ethics officials and other federal employees in response to multiple questions it had received about the permissibility of certain activity under the Hatch Act. AO at 1; Am. Compl. ¶ 18. This was a routine exercise of OSC's authority to advise federal employees on its interpretation of the scope of the Hatch Act, which is a "mechanism for dispensing informal advice" that the Supreme Court and D.C. Circuit have "specially commended" as "a valuable public service." *O'Connor*, 747 F.2d at 754.

Further, as in *O'Connor*, the OSC Advisory Opinion is not the final say on the scope of what activities are prohibited under the Hatch Act. Instead, pursuant to the statutory scheme, it is the MSPB—not the Special Counsel—that determines whether a Hatch Act violation has occurred. 5 U.S.C. §§ 1204(a), 1215(a)(3); 5 C.F.R. § 734.102(b). Plaintiffs concede this point when they acknowledge that "the guidance itself is not legally binding on MSPB." Am. Compl. ¶ 46. Yet Plaintiffs allege no proceeding before the MSPB, or any threat by OSC of initiating such a proceeding, let alone against one of their members. The Complaint thus fails the ripeness test, which requires the "action giving rise to the controversy [to be] final and not dependent upon future uncertainties or intervening agency rulings." *Charter Fed. Sav. Bank v. Office of Thrift Supervision*, 976 F.2d 203, 208 (4th Cir. 1992).

– 16 –

Finally, even after an opportunity to amend, Plaintiffs here have presented "no precise fact accounting" or "fact-particular case" that would suffice for Article III judicial review. *O'Connor*, 747 F.2d at 756.  Instead, Plaintiffs have merely expressed displeasure with the content of OSC's Advisory Opinion in a vacuum.  Just as in *O'Connor*, OSC "has confronted no [AFGE] member with a prosecution threat should he or she" engage in particular speech or activity, and Plaintiffs' Amended Complaint therefore "presents no crystallized controversy" that is ripe for review.  *Id.* Plaintiffs have not, for example, identified speech they wish to engage in with the requisite "fact-particular" specificity.  After amending their Complaint to address this very shortcoming, Plaintiffs can muster only two members who wish to engage in speech that is described in only vague and conclusory terms.  *See* Am. Compl. ¶¶ 48-49.[10]  What is more, Plaintiffs have not alleged that these members, or Plaintiffs themselves, have sought clarification from OSC whether the particular speech these individuals wish to make—in contrast to the conclusory framing in paragraphs 48 and 49—is indeed restricted by the Hatch Act.  They have not, for example, contacted OSC for advice specific to their situations.  It is entirely possible that whatever these two individual members wish to say would not rise to the level of a Hatch Act violation, let alone prompt an investigation or disciplinary action from OSC's perspective.  Congress vested the Special Counsel with the authority to issue advisory opinions for a reason; Plaintiffs' resort to federal court in lieu

---

[10] Although Plaintiffs in their motion for preliminary injunction supplemented the allegations of the Amended Complaint by relying on two undated affidavits from two union members, those statements are similarly conclusory.  In fact, insofar as they forecast any prospective speech by the affiants, these affidavits on their face suggest that this speech would fall outside the Hatch Act. *See* Aff. of Ashby Crowder ¶ 4; Aff. of Kimberlee Ried ¶ 4, ECF No. 20-2, Exs. C, D (averring that her foregone speech "would not be to advocate for or against Donald Trump as a candidate in a future election").  In any event, Plaintiffs have shown no reason why these perhaps more particularized allegations—even if themselves conclusory—could not have been incorporated into the Amended Complaint, as would be necessary if Plaintiffs hoped to rely on them to support jurisdiction.

of that prescribed mechanism should be rejected.

This Court would not be the first to follow *O'Connor* in rejecting a challenge to an OSC advisory opinion on ripeness grounds. In an employee's Hatch Act dispute with OSC that spanned two separate cases, two different district judges in the Southern District of California each concluded that a lack of ripeness compelled dismissal. *See Newcomb v. OSC*, No. 10CV1923, 2010 WL 4055572 (S.D. Cal. Oct. 15, 2010) ("*Newcomb I*"); *Newcomb v. OSC*, No. 11-cv-2431-H, 2012 WL 12906359 (S.D. Cal. Jan. 23, 2012) ("*Newcomb II*"), *dismissed*, 550 F. App'x 532 (9th Cir. 2013). In *Newcomb I*, the plaintiff sued OSC on the basis of an advisory opinion stating the circumstance under which a local school board election would become a partisan election—and from which the plaintiff would be barred as a candidate by the Hatch Act. 2010 WL 4055572, at *1-2. The court found that *O'Connor* was "on all fours" with the case before it:

> As in *O'Connor*, the OSC in this case has rendered an advisory opinion, but has not initiated any prosecution. Indeed, according to the OSC, the OSC has not even opened an investigative file or initiated an investigation regarding Plaintiff's involvement in the Board election. One can only speculate whether the OSC will initiate an investigation and, assuming a violation is found, will choose to file a complaint with the MSPB. Even if the OSC files a complaint with the MSPB, the MSPB may not agree that a Hatch Act violation has occurred.

*Id.* at *4 (citation omitted). Recognizing the "difficult decision" the plaintiff faced and his "invocation of the First Amendment," the court, alluding to the prospect of an enforcement proceeding, noted that "employees must make some hard choices and run some risks." *Id.* at *6. In *Newcomb II*, the same plaintiff sought a judicial declaration that the Hatch Act did not prohibit him from running for the school board position. 2012 WL 12906359, at *2. The court again dismissed on ripeness grounds, explaining that the plaintiff had shown no "'actual and well-founded fear' that a Hatch Act investigation will take place." *Id.* at *3.

As in *Newcomb I*, in this case there is, at best, "uncertainty . . . whether the OSC will

choose to prosecute [any of Plaintiffs' members] and, if the OSC chooses to do so, how the MSPB will rule," and, for that reason "the controversy is not ripe for judicial resolution." 2010 WL 4055572, at *5. Indeed, the case for dismissal on ripeness grounds is even stronger because, unlike the plaintiff in *Newcomb I*, neither Plaintiffs nor any of their members have stated any specific intention to engage in activities that OSC has opined are off-limits, let alone been individually advised by OSC that those activities would run afoul of the Hatch Act. Thus, just as in *Newcomb II*, Plaintiffs can show no "actual or well-founded fear," 2012 WL 12906359, at *3, by any of their members that an enforcement proceeding, or even an investigation, will occur.[11]

*O'Connor* is moreover in line with similar Fourth Circuit ripeness precedents. The Fourth Circuit has declined judicial review of constitutional and statutory challenges to, for example: a state restriction on publishing private information from certain state records when the plaintiff failed to detail the origin of the records she had published, *Ostergren v. Cuccinelli*, 615 F.3d 263, 288 (4th Cir. 2010) (claim unripe when "we have no evidence, no argument, and no underlying dispute for the thorny constitutional question that Ostergren has raised"); a restriction on the plaintiff sex-offender's ability to access school and church grounds, when she had not availed herself of the mechanism available to request such access, *Doe v. Va. Dep't of State Police*, 713 F.3d 745, 758-59 (4th Cir. 2013) ("Because Doe has yet to petition a Virginia circuit court for permission to enter school or church property, all [but one] of her constitutional claims . . . are

---

[11] Prior to *O'Connor*, the D.C. district court foreshadowed that ripeness ruling, at least twice refusing on jurisdictional grounds to hear cases brought by employees concerned about prospective Hatch Act enforcement when they had not yet obtained OSC's (or its predecessor, the Civil Service Commission's) views about the permissibility of their intended conduct. *See French v. Devine*, 547 F. Supp. 443, 447 (D.D.C. 1982) ("The court is unwilling to adjudicate the issues . . . when it is not sufficiently certain that the Special Counsel and the MSPB will act against French."); *Dingess v. Hampton*, 305 F. Supp. 169, 175 (D.D.C. 1969) (dismissing First Amendment challenge to Hatch Act because of "the availability of a judicially reviewable administrative determination of amenability to the Hatch Act as a bar to the exercise of jurisdiction").

dependent on future uncertainties and thus not ripe for judicial decision."); and a county's alleged failure to register certain bonds under the federal securities statute prior to any determination that those bonds were actually subject to a registration requirement, *Gasner v. Bd. of Supervisors of Cty. of Dinwiddie*, 103 F.3d 351, 360-61 (4th Cir. 1996) (claim unripe when plaintiff's alleged injury would occur only "*if* it be later 'deemed' that [the] interest [on the bonds] was subject to federal income taxation" and "nothing in the record shows that appellants have suffered any injury thus far and the future effect of the law relied upon remains wholly speculative" (emphasis added)).

> **2.   Premature judicial review would harm OSC and Congress's Hatch Act enforcement scheme, while Plaintiffs would not be harmed by permitting their claim to ripen into a concrete dispute.**

Permitting this case to go forward with inchoate factual allegations would undermine the Hatch Act enforcement process.  Congress did not contemplate a role for district courts to oversee OSC's advisory opinions issued to the federal workforce as a whole, but instead provided for the MSPB, and if necessary the Federal Circuit, to review allegations of Hatch Act violations by individual employees on the basis of concrete facts.  *See* 5 U.S.C. §§ 1215(a), 7703(b)(1).  In addition, premature review would prejudice OSC by deterring it from issuing advisory opinions that federal agencies and employees rely upon, and which are an important aspect of the congressional design.  As the *O'Connor* court noted, "[i]f every [advisory] opinion that displeased the party requesting it could be attacked in court, the Special Counsel might hesitate to devote the limited resources of his office to this work."[12]  747 F.2d at 754.  Permitting judicial review based on the Opinion alone, without any allegation of even threatened enforcement, would have an "inhibitive effect . . . on the performance of a valuable public service."  *Id.*

---

[12] As noted above, the HAU's staff of six attorneys currently provides Hatch Act advice in response to over 1,000 inquiries in a typical year.  Galindo-Marrone Decl. ¶ 7.

The potential hardship to Plaintiffs or their members, on the other hand, is speculative and ill-defined.  While Plaintiffs' allegations make clear their dislike for OSC's Advisory Opinion, notwithstanding their newly added allegations of harm to two AFGE Local 2578 members who have "refrained" from vaguely defined speech, *see* Am. Compl. ¶¶ 48-49, Plaintiffs never make clear just what speech these employees would like to engage in that the Opinion allegedly restricts. The new allegations are thus far from the "immediate, direct, and significant" hardship that a plaintiff must show to justify immediate review.  *W. Va. Highlands Conservancy, Inc. v. Babbitt*, 161 F.3d 797, 801 (4th Cir. 1998).

Plaintiffs make much of the alleged First Amendment interest at the core of their case.  *See* Am. Compl. ¶¶ 2, 5, 47.  Yet courts have held that when First Amendment rights—even one as closely held as the right to vote—are alleged to be at stake, that alone is not enough to overcome what is at bottom a speculative potential harm.  *See Kemler v. Poston*, 108 F. Supp. 2d 529, 542-43 (E.D. Va. 2000) (challenge to judicial ethics opinion defining voting in a primary election as unethical found unripe when opinion had not been applied).  And while Plaintiffs gesture to the possibility of OSC enforcement in a hypothetical future case, *see* Am. Compl. ¶ 45, a "threat of civil enforcement is considered a hardship that generally does not call for judicial intervention." *Kemler*, 108 F. Supp. 2d at 542 (citing *Lee v. Oregon*, 107 F.3d 1382, 1391-92 (9th Cir. 1997)).

Finally, this Court has its own "interest in avoiding unnecessary adjudication and in deciding issues in a concrete setting."  *Reg'l Mgmt. Corp. v. Legal Servs. Corp.*, 186 F.3d 457, 465 (4th Cir. 1999).  There is no warrant to expend judicial resources when the legal question at the center of Plaintiffs' Complaint can be decided by the MSPB, as Congress intended, followed if necessary by judicial review in the Federal Circuit.

C.      **Congress Has Foreclosed Plaintiffs' Attempt to Bypass the CSRA's Exclusive Review Scheme by Filing Suit in District Court.**

Finally, Plaintiffs cannot proceed in this Court because Congress did not provide jurisdiction for district courts, in the first instance, to review broad challenges to OSC advisory opinions concerning the scope of the Hatch Act.  Instead, Congress established in the CSRA a detailed, exclusive review mechanism for such challenges to commence at the administrative level in the event of an alleged violation for which OSC elects to pursue disciplinary action.  The challenge is first presented to the MSPB, which possesses specialized expertise in this area, followed, if necessary, by judicial review in the Federal Circuit.  Under Supreme Court and Fourth Circuit precedent, Plaintiffs may not bypass this dedicated review scheme by proceeding to sue directly in district court.

"Congress can . . . impliedly preclude jurisdiction by creating a statutory scheme of administrative adjudication and delayed judicial review in a particular court."  *Bennett v. SEC*, 844 F.3d 174, 178 (4th Cir. 2016); *see Arch Coal, Inc. v. Acosta*, 888 F.3d 493, 498 (D.C. Cir. 2018) (when statute expressly provides for judicial review following administrative review, "it is ordinarily supposed that Congress intended that procedure to be the exclusive means of obtaining judicial review in those cases to which it applies").  Thus, when a claim can be "meaningfully addressed in the Court of Appeals" under an exclusive statutory review scheme, a district court lacks jurisdiction.  *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 201 (1994).

Here, the statutory scheme makes plain that Congress intended for judicial review in the Federal Circuit, not district courts, and that such review be undertaken only *after* the MSPB has had an opportunity to issue a decision.  Moreover, a party's challenge to OSC's interpretation of the Hatch Act is just the type of claim that Congress intended to fall within the statutory review scheme.  Because Plaintiffs' claims are subject to Congress's decision to channel review before

– 22 –

the MSPB and, if necessary, in the Federal Circuit, this Court lacks jurisdiction to hear this case.

      **1.**      **The CSRA establishes a scheme of exclusive review by the MSPB, with judicial review in the Federal Circuit, not the district courts.**

By enacting the CSRA, Congress "established a comprehensive system for reviewing personnel action taken against federal employees." *United States v. Fausto*, 484 U.S. 439, 455 (1988). In the CSRA, Congress not only made the exclusive review scheme for alleged Hatch Act violations by federal employees "fairly discernible," but "exhaustively detail[ed] th[at] system of review before the MSPB and the Federal Circuit." *Elgin v. Dep't of Treasury*, 567 U.S. 1, 11 (2012). When OSC determines that a federal employee has engaged in prohibited political activity under the Hatch Act, and should be disciplined, Congress directed the Special Counsel to "prepare a written complaint . . . and present the complaint" to the MSPB. 5 U.S.C. § 1215(a)(1); *see id.* § 1212(a)(2)(B). Congress then authorized the MSPB to "hear [and] adjudicate" and "take final action" on "all matters" within its jurisdiction. *Id.* § 1204(a)(1). That jurisdiction includes "[a]djudicatory authority in Hatch Act enforcement cases," which "resides exclusively in the MSPB." *O'Connor*, 747 F.2d at 749; *id.* at 755 ("Congress has installed the MSPB as the administrative forum of first resort in the adjudication of Hatch Act enforcement cases."); *Williams v. MSPB*, 55 F.3d 917, 920-21 (4th Cir. 1995). In that role, the MSPB "refin[es] the law of prohibited political activities through the continual decision of cases and the coordination of the rules that emerge from them[, and] the process of applying administrative experience and expertise to the ever-varying fact patterns in this constitutionally delicate field." *O'Connor*, 747 F.2d at 755. This responsibility includes deciding the validity of OSC's Hatch Act interpretations, 5 U.S.C. §§ 1204(a)(1), 1215(a), and "the MSPB is free to disagree with the Special Counsel." *O'Connor*, 747 F.2d at 753.

In "painstaking detail," *Elgin*, 567 U.S. at 11, Congress created a scheme under which the

MSPB is "the agency charged with enforcement of the [Hatch] Act," subject to judicial review in the Federal Circuit.  *Williams*, 55 F.3d at 921.  As the Supreme Court concluded in *Elgin*: "it is fairly discernible that Congress intended to deny such employees an additional avenue of review in district court."  567 U.S. at 12.  The exclusivity of the CSRA's statutory review scheme also aligns with its overall purpose: to establish an "integrated scheme of review" that replaces the "outdated patchwork of statutes and rules" that created the potential for inconsistent decisionmaking "in district courts across the country."  *Id.* at 13-14.  There can be little question that Congress intended for the CSRA's review scheme to be exclusive.

> **2.    Plaintiffs have asserted claims that Congress intended to proceed first before the MSPB, followed if necessary by judicial review in the Federal Circuit.**

As to the second *Thunder Basin* factor, Plaintiffs' claims that OSC has erroneously interpreted the Hatch Act in its Advisory Opinion are claims that Congress intended to be reviewed under the CSRA's exclusive scheme.  Consideration of three factors determines whether a plaintiff's claims "are of the type Congress intended to be reviewed within th[e] statutory structure": "(1) whether the statutory scheme 'foreclose[s] all meaningful judicial review[,]' . . . (2) the extent to which the plaintiff's claims are 'wholly collateral' to the statute's review provisions, and (3) whether 'agency expertise could be brought to bear on the . . . questions presented.'"  *Bennett*, 844 F.3d at 181 (first alteration in original) (quoting *Thunder Basin*, 510 U.S. at 212-13, 215).

The first and third factors can be quickly dispatched.  The first (no meaningful judicial review) is plainly absent, since the CSRA expressly allows the Federal Circuit to review a final decision of the MSPB adverse to an employee.  *See* 5 U.S.C. § 7703(b)(1); 5 C.F.R. § 1201.127(a).  And such review would indubitably be "meaningful," since the Federal Circuit directly addresses

questions of how to interpret the Hatch Act.  *See, e.g.*, *McEntee v. MSPB*, 404 F.3d 1320 (Fed. Cir. 2005); *Briggs v. MSPB*, 331 F.3d 1307 (Fed. Cir. 2003).  Nor could the third factor (lack of agency expertise) plausibly apply because the MSPB "has broad exposure to the many varied fact settings in which Hatch Act cases may arise," *Campbell v. MSPB*, 27 F.3d 1560, 1566 (Fed. Cir. 1994), and in those settings it "routinely considers" a variety of statutory and constitutional claims. *Elgin*, 567 U.S. at 22-23; *see also Campbell*, 27 F.3d at 1566 ("[T]he Board's experience tilts in the direction of according a measure of deference to their conclusions").

That leaves only the second factor—claims "wholly collateral" to the CSRA's review scheme.  As the Fourth Circuit has clarified, a claim is not "wholly collateral" if it is "'the vehicle by which [the plaintiff] seek[s] to reverse' agency action."  *Bennett*, 844 F.3d at 186 (quoting *Elgin*, 567 U.S. at 22).  Here, however, if OSC were to initiate a disciplinary action against Plaintiffs or one of their members based on the reasoning in the Advisory Opinion, Plaintiffs could then raise their constitutional arguments and challenge OSC's authority to issue the Opinion (or more generally OSC's interpretation of the Hatch Act), and thereby seek to invalidate the Opinion (and the disciplinary action as well).  But such a dispute is the type that Congress intended the MSPB to review in the first instance.

Plaintiffs' claims are premised on the proposition that "the Hatch Act does not encompass the restrictions that [OSC] imposed [in the Advisory Opinion], and if it did, the law would violate the First Amendment."  Am. Compl. ¶ 3.[13]  That type of challenge to a personnel action—if it were

---

[13] It appears from Plaintiffs' pleading that they primarily seek a First Amendment ruling on the Opinion, with a ruling on the scope of the Hatch Act as an alternative remedy.  *See* Am. Compl. ¶¶ 55, 66, 73.  They frame their alternative request for a statutory ruling, however, as "a matter of constitutional avoidance."  *Id.*  This approach misapprehends the doctrine of constitutional avoidance, which is intended to *avoid* rulings on constitutional questions in favor of a non-constitutional disposition.  Confusingly, Plaintiffs thus appear to ask the Court to "avoid" the very constitutional question they have urged the Court to decide in the first place.

ripe—"is precisely the type of personnel action regularly adjudicated by the MSPB and the Federal Circuit within the CSRA scheme." *Elgin*, 567 U.S. at 22.  And the fact that Plaintiffs assert a constitutional challenge does not confer "wholly collateral" status on their claims.  As the Supreme Court explained in *Elgin*, the exclusivity of the CSRA's review scheme is not disturbed "simply because a covered employee challenges a covered action on the ground that the statute authorizing that action is unconstitutional." *Elgin*, 567 U.S. at 13.  Nor does merely alleging a constitutional violation withdraw from the MPSB and Federal Circuit the capacity to hear those claims.

For example, in *Smith v. Department of Transportation*, the MSPB considered an employee's claim that disciplinary action violated his First Amendment speech rights.  106 M.S.P.R. 59, 78-79 (2007).  In *Briggs v. MSPB*, the affected employee claimed that the Hatch Act's prohibition on partisan political candidacy was unconstitutional as applied to District of Columbia public school teachers.  331 F.3d at 1315.  And in *McEntee v. MSPB*, the affected employee argued, among other things, that the Hatch Act was unconstitutionally vague as applied to his candidacy for elective office, and the MSPB and Federal Circuit considered and rejected that claim.  404 F.3d at 1333-34.  These decisions illustrate that the MSPB and Federal Circuit are capable of deciding the claims that Plaintiffs assert here.

The CSRA creates an exclusive review scheme for Plaintiffs' claims, and they cannot evade that scheme by proceeding directly to district court.  Even assuming that Plaintiffs' claims were ripe, dismissal on jurisdictional grounds is nonetheless warranted.

## II.   PLAINTIFFS HAVE FAILED TO STATE A CLAIM UNDER EITHER THE FIRST OR FIFTH AMENDMENT.

Even if Plaintiffs could establish subject-matter jurisdiction, the Amended Complaint should nonetheless be dismissed because they have failed to state a valid claim for relief.  The Supreme Court has recognized that the government "may impose restraints on the job-related

speech of public employees that would be plainly unconstitutional if applied to the public at large." *United States v. Nat'l Treasury Emps. Union*, 513 U.S. 454, 465 (1995) ("*NTEU*"). "*Pickering* [*v. Board of Education of Township High School District 205*, 391 U.S. 563 (1968)] provides the framework for analyzing whether the employee's interest or the government's interest should prevail in cases where the government seeks to curtail the speech of its employees."  *Lane v. Franks*, 573 U.S. 228, 236 (2014); *see also Liverman v. City of Petersburg*, 844 F.3d 400, 407-08 (4th Cir. 2016). Although courts have observed that assessing the constitutionality of a generally applicable speech restriction—as opposed to a post hoc disciplinary action—warrants some modification of the *Pickering* analysis, the framework remains the applicable standard for evaluating the constitutionality of both types of regulation.[14]

Under *Pickering*, when evaluating a challenge to a restriction on the speech of government employees in their capacities as private citizens speaking on a matter of public concern, a court must balance (1) "the interests of the [employee], as a citizen, in commenting upon matters of public concern" and (2) "the interest of the [government], as an employer," in protecting the asserted interest.  391 U.S. at 568.  When the restriction on employees' off-duty speech about matters of public concern operates *prospectively*, the government must "show that the interests of both potential audiences and a vast group of present and future employees in a broad range of present and future expression are outweighed by that expression's 'necessary impact on the actual operation' of the Government."  *NTEU*, 513 U.S. at 468 (quoting *Pickering*, 391 U.S. at 571); *see also Liverman*, 844 F.3d at 407.  Finally, the government must demonstrate that the speech

---

[14] As more fully explained in Defendant's opposition to Plaintiffs' motion for preliminary injunction, the Advisory Opinion's interpretation of the Hatch Act does respond to harms that are "real, not merely conjectural" and the restriction "will in fact alleviate these harms in a direct and material way."  *Liverman*, 844 F.3d at 407 (quoting *NTEU*, 513 U.S. at 475).

restriction is a "reasonable response to the posited harms" and "that the regulation will in fact alleviate these harms in a direct and material way." *NTEU*, 513 U.S. at 475-76 (citation omitted).

Under this standard, Plaintiffs have failed to state a claim that the Advisory Opinion is unconstitutional on any of the grounds asserted.

### A.    OSC's Advisory Interpretation of the Hatch Act is Not Overbroad (Count I).

First, Plaintiffs challenge the Opinion as overbroad in violation of the First Amendment. But under the standard applicable to government employees' speech, the Opinion passes muster because, as courts have regularly recognized as to the Hatch Act and its regulations, "the interests of both potential audiences and a vast group of present and future employees in" the expression restricted under the Opinion "are outweighed by that expression's 'necessary impact on the actual operation' of the Government." *NTEU*, 513 U.S. at 468 (quoting *Pickering*, 391 U.S. at 571).

Plaintiffs assert that "[a] statute is overbroad in violation of the First Amendment where 'a substantial number of [the statute's] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.'" Am. Compl. ¶ 52 (alterations in original) (quoting *United States v. Stevens*, 559 U.S. 460, 473 (2010)). But that overbreadth standard derives from *United States v. Stevens*, which involved a statute of general applicability that criminalized commerce in depictions of animal cruelty. While such nominal overbreadth may be fatal when a speech restriction applies to the general public, it is not a basis for invalidating a restriction on government employees' speech.

As noted *supra*, under *Pickering*, the government need only demonstrate that the challenged restriction on employee speech is a "reasonable response to the posited harms" and "that the regulation will in fact alleviate these harms in a direct and material way." *NTEU*, 513 U.S. at 475-76 (citation omitted). While the Fourth Circuit has not expounded on this standard,

– 28 –

the D.C. Circuit has been clear not to construe this aspect of the *Pickering* test to require the type of heightened showing of "fit" that is found in other First Amendment inquiries.  *See, e.g.*, *Sanjour v. EPA*, 56 F.3d 85, 97 (D.C. Cir. 1995) (distinguishing courts' consideration of "whether the challenged statute or regulation is tailored to address the harm that the government allegedly aims to protect" from requirement "outside the *Pickering* context, that the government may not burden substantially more speech than necessary to further the government's legitimate interests" (citation omitted)).  Instead, as the D.C. Circuit explained, in conducting the *Pickering* balancing test, the fact that a restriction might reach a broad swath of expression is merely a factor that weighs in support of the employees' interest.  *Sanjour*, 56 F.3d at 97-98 (noting that while "outside the *Pickering* context, . . . the government may not 'burden substantially more speech than necessary to further the government's legitimate interests,'" under *Pickering*, fact that challenged regulations affect a "great quantity of speech" simply "weighs heavily on the side of the employees" in the *Pickering* balance) (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 799 (1989)).

Even assuming the Advisory Opinion sweeps in "a great quantity of speech" (which it does not), it nonetheless survives the *Pickering* inquiry.  While restricting a substantial amount of speech would "weigh[] heavily on the side of the employees," *Sanjour*, 56 F.3d at 97-98, that factor is outweighed by the "obviously important [government] interests sought to be served by the limitations on partisan political activities," *Letter Carriers*, 413 U.S. at 564, and the "*demonstrated ill effects* of Government employees' partisan political activities," *NTEU*, 513 U.S. at 471 (emphasis added).  And because the Opinion restricts employees' use and display of terms and phrases that "have become slogans of political parties and partisan political groups," Clarification at 1, it is a "reasonable response to the posited harms" and "will in fact alleviate these harms in a direct and material way," *NTEU*, 513 U.S. at 475-76.  Moreover, because neither the

Hatch Act nor the Opinion restricts federal employees' speech in either the "#Resist" category or the impeachment category when they are "off-duty and away from the federal workplace," *see, e.g.*, AO at 2, the claimed overbreadth is substantially muted.  Accordingly, the *Pickering* balance favors OSC.

Moreover, even if the Advisory Opinion were examined under the standard for evaluating an overbreadth challenge to a speech restriction outside of the government employee context of *Pickering*, Plaintiffs' challenge would still fail.  This is because Plaintiffs do not allege that the Opinion sweeps in a "substantial" amount of speech that the Hatch Act itself cannot lawfully restrict.  Rather, Plaintiffs seem to accept that some speech falling under each category may be prohibited under the Hatch Act.  *See, e.g.*, Am. Compl. ¶ 53 (recognizing that under the Hatch Act, the government may "prevent[] federal employees from engaging in partisan political activity directed at the success or failure of a political candidate"); *see also id.* ¶¶ 30, 33.   Other than Plaintiffs' conclusory assertions that OSC's interpretation is overbroad, the Amended Complaint contains only one allegation describing the alleged overbreadth: that the Opinion's "presumptive prohibition against using terms like 'Resistance' or '#Resist' untethered to some specific issue[] restricts and chills a wide range of speech on matters of public concern that have nothing to do with advocating for or against the defeat of a candidate for office," because "[f]ederal employees use these terms to express policy goals or disagreements, social activism, and any number of other sentiments that do not relate to electoral politics."   Am. Compl. ¶ 40.   But the activity that this allegation contemplates is not prohibited, as the Opinion specifically states.  *Compare* Clarification at 2 ("Usages of the terms 'resist' and 'the Resistance' while on duty or in the workplace that are *not directed* toward the success or failure of a political party, candidate for partisan political office, or partisan political groups are *not prohibited* by the Hatch Act." (emphases added)) *and* AO at 2

*with* Am. Compl. ¶ 40 (alleging that "[f]ederal employees use . . . terms [like 'Resistance' or '#Resist'] to express policy goals or disagreements, social activism, and any number of other sentiments that do not relate to electoral politics."). Thus, as to uses of "#Resist," the face of the Opinion is not overbroad in the manner Plaintiffs posit. And as to impeachment, Plaintiffs make no specific allegation that the Opinion is overbroad, and rest instead on conclusory allegations. *See* Am. Compl. ¶¶ 53-54.

For all of these reasons, Plaintiffs fail to allege any "real" and "substantial" overbreadth when "judged in relation to the statute's plainly legitimate sweep." *Broadrick v. Oklahoma*, 413 U.S. 601, 615 (1973).[15]

**B.     The Advisory Opinions Do Not Impermissibly Discriminate on the Basis of Either Content or Viewpoint (Count II).**

Plaintiffs assert that in issuing the Advisory Opinion, OSC engaged in both content- and viewpoint-discrimination. But in the government employee speech context, the First Amendment permits speech restrictions based on the type of speech at issue. And Plaintiffs are simply wrong that OSC engaged in viewpoint discrimination: the Opinion applies with the same force to those

---

[15] Plaintiffs attempt to bootstrap their challenge to the Advisory Opinion to a broader attack on separate provisions of the Hatch Act—namely, the prohibitions in 5 U.S.C. § 7323(a) against soliciting political contributions and using official authority to affect an election. Am. Compl. ¶¶ 42-44. They also stray from their challenge to the Opinion and set their sights on how OSC interpreted § 7323(a) in its separate February 2018 Social Media Guidance. But the Opinion is silent on this provision (which Plaintiffs do not challenge), and it operates independently of the "political activity" prohibition. In any event, OSC's view of the circumstances in which impeachment advocacy or use of the term "#Resist" while on duty may constitute "political activity" under § 7324(a) would seem to have little bearing on the hypothetical scenarios Plaintiffs envision—a late-night retweet inviting followers to a fundraising event for a pro-impeachment organization, Am. Compl. ¶ 42, or a weekend post on the consequences impeachment would have on foreign diplomacy, *id.* ¶ 43. Finally, the allegations of these paragraphs suffer from the same deficiency as the balance of the Amended Complaint: the scenarios are imagined by Plaintiffs' counsel, not desired activities of specific members of the Plaintiff organizations, and lack the sort of concrete allegations that would permit the Court to exercise Article III jurisdiction.

who support the incumbent President and his policies as to those who oppose them.

          **1.**      **Regulation of government employees' speech based on its content is not subject to strict scrutiny, and has been repeatedly upheld.**

Plaintiffs contend that the Advisory Opinion is an "unconstitutional content-based" restriction on speech. Am. Compl. ¶ 59. They rely on *Reed v. Town of Gilbert*, a decision that did not involve the on-duty speech of government employees, but rather a town's outdoor signage ordinance. 135 S. Ct. 2218, 2224-25 (2015). But because "Congress may impose restraints on the job-related speech of public employees that would be plainly unconstitutional if applied to the public at large," *NTEU*, 513 U.S. at 465, "constitutional review of government employment decisions must rest on different principles than review of speech restraints imposed by the government as sovereign," *Waters v. Churchill*, 511 U.S. 661, 674 (1994); *see also Urofsky v. Gilmore*, 216 F.3d 401, 406 (4th Cir. 2000) ("[T]he state, as an employer, undoubtedly possesses greater authority to restrict the speech of its employees than it has as sovereign to restrict the speech of the citizenry as a whole."). As the Fourth Circuit has recognized, the "government may restrict certain types of speech to promote the effective performance of its function," and such restrictions "may well be appropriate." *Thomasson v. Perry*, 80 F.3d 915, 933 (4th Cir. 1996) (en banc).

For these reasons, the test for restrictions on government employees' speech is not the exacting one that Plaintiffs have proposed, and which applies in other contexts to content-based restrictions—that is, whether the restriction is "narrowly tailored to serve a compelling state interest." Am. Compl. ¶ 57. Rather, under *Pickering*, the government must show that its employees' interest in the restricted speech is "outweighed by that expression's 'necessary impact on the actual operation' of the Government." *NTEU*, 513 U.S. at 468. Indeed, this test expressly contemplates that the government will consider the content of the speech in determining whether it should be restricted. Therefore, while content-based discrimination is subject to strict scrutiny

when the government restricts the speech of the general public, a more relaxed standard applies to restrictions the government imposes as employer.[16]  In any event, the Opinion is no more "content-based" than the Hatch Act provision it interprets: the prohibition against "engag[ing] in political activity," *see* 5 U.S.C. § 7324(a), necessarily entails review of the content of the employee's activity to determine whether it meets the definition of "political activity."  At least one court has found that this specific provision "easily passes" First Amendment muster.  *Burrus*, 336 F.3d at 91.  And, more broadly, "[t]he Supreme Court has consistently found that the Hatch Act is constitutional and does not violate the First Amendment."  *Williams*, 55 F.3d at 921 n.7 (citing *Broadrick*, 413 U.S. 601; *Letter Carriers*, 413 U.S. 548).  Plaintiffs' content-discrimination claim should be dismissed.

### 2.    The Advisory Opinion does not discriminate based on viewpoint.

Plaintiffs also contend that the Advisory Opinion "impermissibly discriminates based on the viewpoint of the speaker."  Am. Compl. ¶ 60.  However, the Hatch Act itself contains no viewpoint-based limitations on political activity, and the Opinion replicates that neutrality by opining that the political activity at issue is prohibited whether directed at the success *or* the failure of a candidate or party.  *See* AO at 1 (making clear that "criticism *or* praise of an administration's policies and actions is not considered political activity" (emphasis added)).  Plaintiffs' summary

---

[16] Further evidencing the permissibility of government restrictions on employees' speech based on content is the fact that the court first looks to "whether the speech at issue was that of a private citizen speaking on a matter of public concern."  *Urofsky*, 216 F.3d at 406.  As the Fourth Circuit explained, "[i]f a public employee's speech made in his capacity as a private citizen *does not touch upon a matter of public concern*, the [government], as employer, may regulate it without infringing any First Amendment protection."  *Id.* (emphasis added).  This very step of the inquiry embodies the notion that the government must consider the content of employees' speech when seeking to restrict it, and thereby undermines Plaintiffs' claim to "content-based" discrimination.  *Id.* ("To determine whether speech involves a matter of public concern, we examine the content, context, and form of the speech at issue in light of the entire record.").

claims of viewpoint discrimination are based on misreadings of the Opinion. Nor can Plaintiffs rescue their claim of viewpoint discrimination by holding up cherry-picked statements of several White House employees and the U.S. Attorney General. Plaintiffs seek a declaration that the Advisory Opinion itself discriminates on the basis of viewpoint, *see* Am. Compl., Prayer for Relief ¶ (b); they do not seek a declaration that OSC's enforcement activities pursuant to the Opinion so discriminate, nor do they ask this Court to remedy any such discriminatory enforcement. Their viewpont-discrimination claim should be dismissed.

*First*, the Opinion is netural on its face in its treatment of both impeachment and the #Resistance. Plaintiffs assert that OSC's advice about impeachment speech "[i]n purpose and effect . . . target[s] and discriminate[s] against employees who favor impeachment, and not those who speak out against impeachment." Am. Compl. ¶ 61. That conclusory contention is belied by the face of the Advisory Opinion. OSC opined that "any advocacy *for or against* an effort to impeach a candidate" is Hatch Act political activity. AO at 2. (Plaintiffs themselves elsewhere acknowledge this point. *See* Am. Compl. ¶¶ 18, 21.) Further, OSC provided two illustrative examples—one of "[a]dvocating for a candidate to be impeached" and a second "advocating against a candidate's impeachment"—and opined that *both* would amount to political activity. AO at 2. At no point in the Opinion did OSC limit its interpretation to advocacy *in favor of* impeachment, as Plaintiffs appear to believe. Plaintiffs, or perhaps their members, may themselves favor impeachment, as their claim suggests, but that does not mean that OSC's Opinion "targets" or otherwise discriminates against them.

Equally unavailing is Plaintiffs' summary assertion that the Advisory Opinion's treatment of the term "#Resist" "targets and discriminates against speakers who oppose the Trump Administration's policies." Am. Compl. ¶ 62. The Advisory Opinion does no such thing. It

opines that statements "relate[d] to resistance to President Donald J. Trump" constitute political activity under the Hatch Act.  AO at 2.  But a statement need not be *against* the President for it to be "related to resistance," as Plaintiffs appear to believe.  OSC also stated (and then reiterated) that usages of the term "resist" that "are not directed toward the success or failure" of a political party, partisan candidate, or partisan political group are not prohibited.  AO at 2; Clarification at 2.  Indeed, the Clarification on its face advises employees that the Hatch Act bars displaying items bearing slogans such as "Make America Great Again" or "#MAGA"—hardly indicative of the sort of political bias that Plaintiffs attribute to OSC.   Clarification at 1.  Contrary to Plaintiffs' bald assertion of viewpoint discrimination, OSC recognizes that the term "#resist" can be deployed by a speaker for a partisan purpose, regardless of whether the speaker supports or opposes Trump Administration policies.

        *Second*, Plaintiffs' citation of various statements by White House personnel and the U.S. Attorney General cannot sustain a claim of viewpoint discrimination.  Plaintiffs have sought to gild their Amended Complaint by adding eleven alleged statements by White House employees and "the official White House twitter account" as well as an excerpted quotation from the Attorney General that, in Plaintiffs' view, apparently show viewpoint discrimination by OSC.  Am. Compl. ¶¶ 62-72.  Yet nowhere do Plaintiffs allege that they or anyone else have submitted a Hatch Act complaint to OSC requesting that these statements be the subject of a Hatch Act investigation.  *See also* Galindo-Marrone Decl. ¶ 30.  Nor have Plaintiffs alleged that OSC has received a Hatch Act complaint regarding any of these statements and treated that complaint differently than OSC treated a comparable Hatch Act complaint concerning pro-impeachment or pro-#Resistance speech.  *See id.* ¶¶ 31-32.  Moreover, Plaintiffs have nowhere alleged that, by contrast, they, their members, or anyone else *has* been the subject of Hatch Act discipline—or even investigation—

based on advocacy in favor of impeachment or pro-#Resistance speech.  *See id.*  Their allegations, on the one hand, that federal employees "who have spoken out against the 'Resistance' have received no adverse action from OSC" while, on the other hand, that OSC "in restricting use of the term '#Resist' and variations thereof, . . . targets and discriminates against speakers who oppose the Trump Administration's policies," thus ring hollow.  Am. Compl. ¶¶ 62-63.[17]

Even assuming, for the purposes of this motion, that Plaintiffs' cited statements fall within the scope of prohibited political activity (a point simply assumed by Plaintiffs, *see* Am. Compl. ¶ 61),[18] the fact that OSC has not taken adverse action against the specified employees does not render the Advisory Opinion "viewpoint discriminatory."  Potentially—and again assuming for the purposes of this motion that these statements constitute political activity under the Hatch Act— had OSC received evidence of these statements as part of a Hatch Act complaint and failed even to investigate them, perhaps Plaintiffs could attempt to assert that OSC was selectively *enforcing* the Hatch Act.  But that—if it would even be a cognizable claim at all, *see Cent. Radio Co. Inc. v. City of Norfolk*, 811 F.3d 625, 635 (4th Cir. 2016) ("[A] plaintiff must show not only that similarly situated individuals were treated differently, but that there was clear and intentional discrimination." (quotation omitted)—is not what they have alleged in Count II.  Rather Plaintiffs have alleged that "OSC's *interpretation* of the Hatch Act, as set forth in the Advisory Opinion and Clarification" is viewpoint-discriminatory.  Am. Compl. ¶ 60 (emphasis added).  Bare citations of

---

[17] In addition, merely "sp[eaking] out against the 'Resistance'" is not enough to fall within the scope of OSC's interpretation of the Hatch Act; rather the speech must be "relate[d] to resistance to President Donald J. Trump."  AO at 2.

[18] The Court should reject Plaintiffs' blithe assumptions that the isolated statements excerpted in paragraphs 61 and 63 are conclusively proven Hatch Act violations.  As Ms. Galindo-Marrone has explained, OSC determines whether particular activity violates the Hatch Act not only by looking to the statements themselves, but also to the totality of the circumstances surrounding the statements.  Galindo-Marrone Decl. ¶ 16 & att. to Ex. I.

isolated statements by White House employees and the Attorney General do not render OSC's interpretation of the Hatch Act viewpoint-discriminatory.[19]

### C.     The Advisory Opinion Is Not Impermissibly Vague (Count III).

Plaintiffs final claim is a challenge to the Advisory Opinion as vague in violation of the First and Fifth Amendments.  Am. Compl. ¶¶ 68-71.  First, Plaintiffs allege that the Opinion is "vague on when uses of ['#Resist'] will be considered to be 'in isolation' . . . , and when they will be considered to be 'in relation to an issue.'"  *Id.* ¶ 71.  Second, Plaintiffs allege that "[f]ederal employees lack fair notice and meaningful standards for understanding when speech arguing for [or] against impeachment is permissible or when it is impermissible 'advocacy.'"  *Id.* ¶ 70. Plaintiffs allege that the complained-of vagueness "unconstitutionally chills protected speech." *Id*. ¶ 72.  Measured against the applicable standard, Plaintiffs' vagueness claim fails.

The Fourth Circuit has observed that "even of regulations that restrict expressive activity," "perfect clarity and precise guidance have never been required."  *Imaginary Images, Inc. v. Evans*, 612 F.3d 736, 749 (4th Cir. 2010).  Rather, when considering a vagueness challenge to speech restrictions, "a court must ask whether the [restrictions] 'are set out in terms that the ordinary person exercising ordinary common sense can sufficiently understand and comply with.'"  *Giovani Carandola, Ltd. v. Fox*, 470 F.3d 1074, 1079 (4th Cir. 2006) (quoting *Broadrick*, 413 U.S. at 608).

### 1.     Use of the term "#Resist" and variations thereof

With respect to use of "#Resist," Plaintiffs' vagueness claim must be rejected, because the phrases "in isolation" and "in relation to an issue," as used by OSC, are not vague.  Merriam-

---

[19] Also, as more fully addressed in Defendant's memorandum in opposition to Plaintiffs' motion for preliminary injunction, Plaintiffs' more general insinuation that OSC is politically aligned with the incumbent Administration (and, apparently, against Plaintiffs and certain of their members), is both unsupported and contrary to the record.  *See* Galindo-Marrone Decl. ¶¶ 35-37 (OSC finding Hatch Act violations by members of both incumbent and prior Administrations).

Webster defines "isolation" as "the condition of being isolated," and further defines "isolated" as "occurring alone or once." *Isolation*, MERRIAM-WEBSTER (online ed. 2020); *Isolated*, MERRIAM-WEBSTER. Merriam-Webster defines "in relation to" as synonymous with "in reference to," which is further defined as, for example, "about" or "concerning." *In relation to*, MERRIAM-WEBSTER. OSC employed these standard definitions in the Advisory Opinion: "employees may violate the Hatch Act by using or displaying . . . '#resist' or 'the Resistance' while on duty or in the workplace," only when that use or display occurs "alone," and not "in relation to an issue." Clarification at 2. OSC emphasized that "using '#resist' in relation to an issue . . . is not political activity under the Hatch Act," and to illustrate the intended meaning of "in relation to," provided examples of permitted usages: "#ResistHate" and "#ResistKavanaugh." *Id.*

Even if reference to dictionary definitions did not dispose of Plaintiffs' vagueness challenge, common sense surely does. *See Wag More Dogs Ltd. Liab. Corp. v. Cozart*, 680 F.3d 359, 371 (4th Cir. 2012) ("[T]o meet the fair warning prong an ounce of common sense is worth more than an 800-page dictionary." (alteration in original)) (citing *United States v. Cullen*, 499 F.3d 157, 163 (2d Cir. 2007)). A common-sense reading of how OSC relies on the phrases "in isolation" and "in relation to an issue" in the Opinion makes clear that OSC will presume that a federal employee's use of the term "#Resist" without connecting it to an issue is political activity, but will not so presume of a federal employee's use of the term when connected to an issue. As OSC opined, it will "presume" that an employee's workplace use or display of the hashtags "#resist" or "#resistTrump" is political activity "unless the facts or circumstances indicate otherwise." AO at 2. An employee may, however, use the words "resist" or "resistance" when they are coupled with or stated in response to other words that demonstrate relation to an issue. *See id.*; Clarification at 2 (opining that phrases "#resist the temptation to eat another donut,"

"#ResistHate," and "#ResistKavanaugh" are permissible). To further dispel any asserted vagueness, the Opinion states that "[u]sages of the terms 'resist' and 'the Resistance' while on duty or in the workplace that are not directed toward the success or failure of a political party, candidate for partisan political office, or partisan political group are not prohibited by the Hatch Act."[20] Clarification at 2.

Fourth Circuit precedent supports dismissal of Plaintiffs' vagueness claim based on standard dictionary definitions and common sense. *See Imaginary Images*, 612 F.3d at 750 (finding "apparent" the meaning of terms "striptease" and "partially nude" based on dictionary definitions and common sense, and rejecting vagueness assertion that it is "it is unclear how much clothing has to be worn to satisfy [these terms]"); *Wag More Dogs*, 680 F.3d at 371 (citing "[d]ictionary definitions and old-fashioned common sense" to reject plaintiff's "entreaties to view the definition of 'sign' in a vacuum and envision ways in which the provision is inadequate"). The Opinion "is surely valid in the vast majority of its intended applications." *Id.* (quotation and citation omitted). This Court should refuse to indulge "'speculation about possible vagueness in hypothetical situations.'" *Id.* (quoting *Hill v. Colorado*, 530 U.S. 703, 733 (2000)).

---

[20] For this reason, the single hypothetical example Plaintiffs offer to support the allegation that the Opinion is "utterly vague" is not sufficient. Am. Compl. ¶¶ 41, 71. Plaintiffs ask "if a federal employee shares an article on social media about the President's desire to build a border wall with a caption that simply stated '#Resist,' would that be an impermissible political statement about President Trump, or a permissible statement because it is 'in relation to an issue'?" *Id.* ¶ 41. But Plaintiffs' hypothetical is itself too vague to support their claim. They have not alleged whether the hypothetical article advances or opposes the re-election of the president, or anything about the circumstances of the social media post such as the timing, audience, or even that the employee is using social media while on duty or in the workplace. *Id.* Accordingly, this hypothetical scenario may be wholly outside the Hatch Act and, moreover, might be subject to separate, agency-specific rules of conduct regarding the use of social media. Plaintiffs' hypothetical further underscores the incomplete factual allegations on which they purport to base their claims.

## 2.       Impeachment advocacy

The Advisory Opinion is not impermissibly vague in stating that advocacy for or against

impeachment by federal employees while on duty is prohibited by the Hatch Act.  OSC contrasted

expressive activity that it views as permissible with expressive activity that it does not:

> OSC has been asked whether an employee may display items that advocate for
> impeachment of the president, who is a candidate for reelection.  OSC has advised
> against this activity because OSC considers advocacy for or against the
> impeachment of a candidate for federal office to be political activity under the
> Hatch Act.  However, merely discussing impeachment, without advocating for or
> against its use against such a candidate, is not political activity.  For example, two
> employees may discuss whether reported conduct by the president warrants
> impeachment and express an opinion about whether the president should be
> impeached without engaging in political activity.

Clarification at 2.  Here, OSC makes clear that both "express[ing] an opinion about whether the

president should be impeached" and "discuss[ing] whether reported conduct by the president

warrants impeachment" do not constitute impermissible political activity under the Hatch Act. *Id.*

OSC thus makes plain that neither activity, in and of itself, constitutes "advocating for or against"

the impeachment of a candidate.[21]  By contrast, to expound on the meaning of "advocacy for or

against impeachment of a candidate," OSC provides the instructive example of "display[ing] items

that advocate for impeachment of the president, who is a candidate for reelection," such as "a

poster that states '#Impeach45' or . . . a 'Don't Impeach Trump' bumper sticker."  This example

illustrates that OSC considers exhortations in support of or opposition to impeachment to constitute

"advocacy."  Plaintiffs thus misread the Advisory Opinion when they assert that Special Counsel

Mueller and his team would have violated the Hatch Act by "recommending that Congress

---

[21] Plaintiffs allege that OSC's "attempt to distinguish between 'state' and 'advocate' . . . is vague."
Am. Compl. ¶ 30.  But nowhere in the Opinion does OSC attempt to distinguish between these
words.  The Opinion uses the verb "state" only once, and does so in the description of a poster
that, in OSC's view, an employee may not display in his or her office.

commence impeachment proceedings against the President."  Am. Compl. ¶ 29.  Even setting aside the fact that in this hypothetical, the Special Counsel and his team would have been engaged in a legitimate government function which they are authorized to perform, an employee expressing his "recommend[ation]" that impeachment proceedings commence plainly falls within what OSC views as non-prohibited activity.  Clarification at 2 (opining that employees may "express an opinion about whether the president should be impeached").

As these distinctions and illustrations show, an "ordinary person exercising ordinary common sense" can "sufficiently understand" OSC's advice regarding employee speech advocating for or against impeachment.  *Giovani Carandola*, 470 F.3d at 1079 (quoting *Broadrick*, 413 U.S. at 608); *see also Imaginary Images*, 612 F.3d at 750; *Wag More Dogs*, 680 F.3d at 372.

*          *          *

Plaintiffs have not identified—and cannot identify—any speech that, when engaged in by federal employees, enjoys First Amendment protection, but which OSC has nevertheless opined is prohibited by the Hatch Act.  And although Plaintiffs allege that federal employees' speech is chilled, they have not identified with adequate specificity any speech foregone by any of their members due to alleged self-censorship owing to the Advisory Opinion.  With Plaintiffs' having failed to do so, the Court's "task is not to dream scenarios in which a regulation might be subject to a successful vagueness challenge.  The Supreme Court has instructed that 'speculation about possible vagueness in hypothetical situations not before the Court will not support a facial attack on a statute when it is surely valid in the vast majority of its intended applications.'" *Wag More Dogs*, 680 F.3d at 372 (quoting *Hill*, 530 U.S. at 733 and *Raines*, 362 U.S. at 23).

Finally, the existence of a mechanism by which a party may seek an advisory opinion from OSC dispels any vagueness concern posed by the Advisory Opinion.  As the Supreme Court

explained in rejecting the plaintiffs' vagueness claim in *Letter Carriers*,

> It is . . . important . . . that the Commission has established a procedure by which an employee in doubt about the validity of a proposed course of conduct may seek and obtain advice from the Commission and thereby remove any doubt there may be as to the meaning of the law, at least insofar as the Commission itself is concerned.

413 U.S. at 580; *see also O'Connor*, 747 F.2d at 754 ("In reaffirming the constitutionality of the text of the Hatch Act, the Supreme Court specially commended this mechanism for dispensing informal advice; the Court believed that the availability of a preliminary opinion in advance of employee action would *alleviate* the Act's potential to chill the exercise of first amendment rights." (emphasis in original)).

For all of these reasons, Plaintiffs have failed to allege that the Advisory Opinion is impermissibly vague, and, accordingly, Count III must be dismissed.

## CONCLUSION

For the foregoing reasons, Defendant's Motion to Dismiss should be granted and Plaintiffs' Amended Complaint should be dismissed with prejudice.


February 19, 2020                         Respectfully submitted,

                                          JOSEPH H. HUNT
                                          Assistant Attorney General

                                          JENNIFER D. RICKETTS
                                          Director
                                          Federal Programs Branch

                                          CHRISTOPHER R. HALL
                                          Assistant Director
                                          Federal Programs Branch

                                          */s/ Julie Straus Harris*
                                          JULIE STRAUS HARRIS (D. Md. Bar No. 18619)
                                          M. ANDREW ZEE (CA Bar No. 272510)

Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW, Room 11514
Washington, D.C. 20005
Tel: (202) 353-7633
Fax: (202) 616-8470
E-mail: julie.strausharris@usdoj.gov

*Counsel for Defendant*